IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 10-0887-CV-W-REL |
| KANSAS CITY TRANSPORTATION GROUP, a/k/a KANSAS CITY TAXI, LLC, | ) ) ) ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. No. 41) and Plaintiff's Motion for Partial Summary Judgment (Document 43). Defendant seeks a determination that the drivers that drive under the contracts between Defendant and Kansas City Area Transit Authority and Kansas City, Missouri School District are not employees. Plaintiff seeks a determination that these same drivers are Defendant's employees, that Defendant's business operations constitute an enterprise, and that Defendant is not entitled to application of the taxicab exemption. For the following reasons, Defendant's Motion for Summary Judgment is denied and Plaintiff's Motion for Partial Summary Judgment is granted.

I.  **BACKGROUND**

Defendant is a limited liability company located in Kansas City, Missouri (Doc. No. 43-1, ¶¶ 1, 2; Doc. No. 48, p. 2). Kansas City Transportation Group, a/k/a Kansas City Taxi, LLC (Defendant) is a fictitious name for Kansas City Shuttle, LLC (Doc. No. 43-1, ¶ ; Doc. No. 48, p. 2). Defendant's principal place of business and corporate address is 1300 Lydia, Kansas City, Missouri (Doc. No. 43-1, ¶¶ 2, 48; Doc. No. 48, p. 2).

Defendant also owns 100% of Spencer Leasing, LLC (Doc. No. 43-1, ¶ 47; Doc. No. 48, p.

1

2). Spencer Leasing, LLC operates a garage out of 1300 Lydia, Kansas City, Missouri (Doc. No. 43-1, ¶ 48; Doc. No. 48, p. 2).

In 2008, some but not all of the vehicles used by drivers for Defendant were manufactured outside of the State of Missouri (Doc. No. 43-1, ¶ 12; Doc. No. 48, p. 2). Defendant also used a dispatch system made by a company headquartered in British Columbia Canada, and Defendant has sent its staff to Lenexa, Kansas for training on this system. (Doc. No. 43-1, ¶¶ 11, 13; Doc. No. 48, p. 2)

Defendant claims its business was the leasing of taxicab equipment and the providing of dispatch and other services to taxicab operators (Doc. No. 42, p. 5). Plaintiff claims Defendant also derived significant revenues from its various transportation contracts with Kansas City Transit Authority and Kansas City, Missouri School District (Doc. No. 49, p. i).

### A. Kansas City Transit Authority

From April 22, 2008 to December 31, 2008, Defendant had contracts with Kansas City Area Transit Authority ("KCATA") for the delivery of on-demand paratransit services for elderly and disabled passengers in the Kansas City metropolitan area, also known as the Share-A-Fare program ("SAF") (Doc. No. 43-1, ¶¶ 3, 6; Doc. No. 48, p. 2). The people who drove the passengers on SAF trips were not signatories on the contract between Defendant and KCATA (Doc. No. 43-1, ¶ 5; Doc. No. 48, p. 2). Defendant was required to furnish a performance bond payable to KCATA to fulfill Defendant's contractual obligation with the SAF program (Doc. No. 43-1, ¶ 130; Doc. No. 48, p. 2). Drivers who drove vehicles in connection with the SAF program were not required to furnish a performance bond in order to participate as a driver in the program (Doc. No. 43-1, ¶ 129; Doc. No. 48, p. 2). Drivers who provided transportation services pursuant to Defendant's contract with KCATA were classified by Defendant as independent contractors (Doc. No. 43-1, ¶ 31; Doc. No. 48, p. 2).

From January 1, 2008 through June 30, 2008, the contract amendment provided for a guaranteed maximum contract sum of $7,429, 893, to be calculated at a rate of $2.18 per passenger mile, for ambulatory paratransit services (Doc. No. 43-1, ¶ 18; Doc. No. 48, p. 2). From January 1, 2008 through June 30, 2008, the contract amendment provided for a guaranteed maximum contract sum of $10,825,358, to be calculated at a rate of $4.47 per passenger mile, for wheelchair paratransit services (Doc. No. 43-1, ¶ 19; Doc. No. 48, p. 2). From July 1, 2008 through December 31, 2008, the contract extension provided for a contract sum not to exceed $1,290,630, to be calculated at a rate of $4.46 per passenger mile, for demand responsive wheelchair services (Doc. No. 43-1, ¶ 20; Doc. No. 48, p. 2). From July 1, 2008 through December 31, 2008, the contract extension provided for a contract sum not to exceed $535,620, to be calculated at a rate of $2.18 per passenger mile, for demand responsive ambulatory services (Doc. No. 43-1, ¶ 21; Doc. No. 48, p. 2). Defendant estimated that in 2008, on an average day, it routed approximately 350 SAF wheelchair trips and 400 SAF ambulatory trips (Doc. No. 43-1, ¶ 120; Doc. No. 48, p. 2).

Drivers providing SAF transportation services were required to wear an armband, badge, or other program identification (Doc. No. 43-1, ¶ 37; Doc. No. 48, p. 2). If a driver did not wear a SAF identifier, KCATA could fine Defendant, but not the driver directly (Doc. No. 43-1, ¶¶ 37, 38; Doc. No. 48, p. 2). If KCATA fined Defendant for a driver's failure to wear a SAF identifier, Defendant would fine the driver the same amount (Doc. No. 43-1, ¶ 40; Doc. No. 48, p. 2).

Drivers who wished to drive in the SAF program would go to Defendant's Contract Office and indicate an interest in participating in the SAF program. (Doc. No. 43-1, ¶ 84; Doc. No. 48, p. 2). The Defendant's Contract Office would provide the driver with information on the SAF program and the driver would tell the Contract Office what days and hours the driver was available for SAF trips (Doc. No. 43-1, ¶ 84; Doc. No. 48, p. 2). Defendant would provide KCATA

3

with a list of drivers interested in performing SAF work (Doc. No. 43-1, ¶ 85; Doc. No. 48, p. 2). KCATA notified prospective drivers of the next SAF training class (Doc. No. 43-1, ¶ 85; Doc. No. 48, p. 2).

To book a SAF trip a passenger would contact KCATA (Doc. No. 43-1, ¶ 87a; Doc. No. 48, p. 2). The day before the scheduled trip, KCATA would electronically send Defendant trip information including passenger name, desired pickup time, pickup address, destination, and fare amount (Doc. No. 43-1, ¶ 87b; Doc. No. 48, p. 2). SAF trips were not directly transmitted from KCATA to the drivers (Doc. No. 43-1, ¶ 97; Doc. No. 48, p. 2). A router for Defendant would manually create manifests, trying to group SAF trips from the same origination area to the same destination area (Doc. No. 43-1, ¶ 87d; Doc. No. 48, p. 2). Defendant's routers generally knew what drivers were available (Doc. No. 43-1, ¶ 87e; Doc. No. 48, p. 2). The parties disagree on whether Defendant's routers matched drivers with routes or whether drivers were not specifically matched with routes (Compare Doc. No. 43-1, ¶ 87f, with Doc. No. 48, ¶ 87f). Drivers could not transport SAF passengers to locations other than those listed on the trip manifest (Doc. No. 43-1, ¶ 95; Doc. No. 48, p. 2).

SAF passengers paid a co-pay fare for each SAF trip (Doc. No. 43-1, ¶ 87j; Doc. No. 48, p. 2). KCATA set the amount of the co-pay (Doc. No. 43-1, ¶ 87k; Doc. No. 48, p. 2). The amount of the co-pay was printed on the driver's pickup manifest (Doc. No. 43-1, ¶ 87k; Doc. No. 48, p. 2). The driver collected the co-pay directly from the passenger (Doc. No. 43-1, ¶ 87j; Doc. No. 48, p. 2). Drivers kept the collected co-pay (Doc. No. 43-1, ¶ 87*l*; Doc. No. 48, p. 2). Drivers were not required to turn the co-pay in to Defendant (Doc. No. 43-1, ¶ 87*l*; Doc. No. 48, p. 2). If a SAF passenger did not have the co-pay, the driver had the discretion to transport the passenger or not (Doc. No. 43-1, ¶ 88; Doc. No. 48, p. 2). If the driver chose not to transport the SAF passenger, the driver had to inform Defendant's dispatcher (Doc. No. 43-1, ¶ 89; Doc. No. 48, p.

4

2). If a SAF passenger did not show up for a scheduled trip, the driver would notify Defendant's dispatchers who would contact KCATA (Doc. No. 43-1, ¶ 118; Doc. No. 48, ¶ 118). In the event of an "incident" e.g., unruly passenger, passenger injury, the driver would contact Defendant's dispatcher who would contact KCATA (Doc. No. 43-1, ¶ 119; Doc. No. 48, p. 2). The Defendant's dispatcher would then relay back to the driver whatever KCATA said (Doc. No. 43-1, ¶ 119; Doc. No. 48, p. 2).

In order for a SAF trip to be paid for by KCATA, the trip had to be scheduled through KCATA's SAF office (Doc. No. 43-1, ¶ 91; Doc. No. 48, p. 2). A driver could not solicit SAF business (Doc. No. 43-1, ¶ 92; Doc. No. 48, p. 2). A driver could not advertise SAF services or encourage the scheduling of SAF trips for SAF customers (Doc. No. 43-1, ¶ 93; Doc. No. 48, p. 2). Drivers who provided SAF transportation services could not directly bill KCATA for SAF trips (Doc. No. 43-1, ¶ 78; Doc. No. 48, p. 2). Drivers could not give their business cards to SAF passengers for SAF purposes (Doc. No. 43-1, ¶ 94; Doc. No. 48, p. 2).

Defendant's accounting department converted the completed manifests into vouchers (Doc. No. 43-1, ¶ 111; Doc. No. 48, p. 2). Defendant issued vouchers to buy the manifest from the driver—to buy back the route (Doc. No. 43-1, ¶ 109, 110; Doc. No. 48, p. 2). The SAF trip voucher's "value" was the miles calculated by KCATA times a mileage rate minus the co-pay amount (whether actually collected or not) (Doc. No. 43-1, ¶ 112; Doc. No. 48, p. 2). Defendant purchased the voucher from the driver for the face value of the voucher (Doc. No. 43-1, ¶ 113; Doc. No. 48, p. 2). Defendant processed and submitted the purchased vouchers to KCATA in a monthly billing (Doc. No. 43-1, ¶ 115; Doc. No. 48, p. 2). Defendant required drivers on SAF routes to turn in the completed manifest within forty-eight hours of completing the route or Defendant would pay less, or potentially nothing, for the completed manifest (Doc. No. 43-1, ¶¶ 116, 117; Doc. No. 48, p. 2).

5

Drivers were responsible for their own fuel costs (Doc. No. 43-1, ¶ 123; Doc. No. 48, p. 2). As part of KCATA's contract with Defendant, KCATA, on occasions with higher fuel prices, provided a quarterly fuel rebate to Defendant (Doc. No. 43-1, ¶ 124; Doc. No. 48, p. 2). The fuel rebates were based on the mileage that drivers had recorded (Doc. No. 43-1, ¶ 125; Doc. No. 48, p. 2). Defendant determined what amount of the fuel rebate each driver would receive based on the miles indicated on the vouchers that Defendant had purchased from the drivers (Doc. No. 43-1, ¶ 126; Doc. No. 48, p. 2). If the driver was no longer classified as an independent contractor with Defendant at the time of the issuance of KCATA's fuel rebate, Defendant kept that driver's portion of the rebate (Doc. No. 43-1, ¶ 128; Doc. No. 48, p. 2).

KCATA restricted the amount of time that a passenger on SAF trips could ride in a vehicle to no more than sixty (60) minutes between pickup and drop-off points (Doc. No. 43-1, ¶ 104; Doc. No. 48, p. 2). KCATA also required SAF passengers to be picked up within thirty (30) minutes of the passenger's scheduled pick-up time (Doc. No. 42, ¶ 41). KCATA calculated the mileage for each individual SAF trip using software that calculated the most direct route for each customer's trip (Doc. No. 43-1, ¶¶ 106, 107; Doc. No. 48, p. 2).

### B. Kansas City, Missouri School District

From April 22, 2008 to December 31, 2008, Defendant had contracts with Kansas City, Missouri School District ("KCMSD") to transport students to and from various schools in KCMSD (Doc. No. 43-1, ¶ 7; Doc. No. 48, p. 2). For 2008, the contract amount to be paid to Defendant by KCMSD for providing alternative mode student transportation was an amount not to exceed $800,000 (Doc. No. 43-1, ¶ 16; Doc. No. 48, p. 2). Defendant was required to provide a letter of credit or performance bond to the school board of KCMSD in connection with the Alternative Mode Student Transportation Service Program contract (Doc. No. 43-1, ¶ 159; Doc. No. 48, p. 2). Drivers were not required to provide a letter of credit or performance bond in

order to participate in the program (Doc. No. 43-1, ¶ 158; Doc. No. 48, p. 2). Defendant classified drivers who provided transportation services pursuant to the contract between Defendant and KCMSD as independent contractors (Doc. No. 43-1, ¶ 31; Doc. No. 48, p. 2).

Driver manifests for KCMSD transportation services were based on information provided by KCMSD to Defendant (Doc. No. 43-1, ¶ 133; Doc. No. 48, p. 2). KCMSD provided Defendant with a list of students, pickup times, and destination (Doc. No. 43-1, ¶ 134; Doc. No. 48, p. 2). The destination or pickup point was always one of the KCMSD schools for all students receiving transportation under this program (Doc. No. 43-1, ¶ 138; Doc. No. 48, p. 2). Defendant's routers attempted to determine the most efficient routes for transportation of students (Doc. No. 43-1, ¶ 135; Doc. No. 48, p. 2). Defendant's routers determined which students should be on a particular route, but the driver determined the order that the students on the route were picked up (Doc. No. 43-1, ¶ 136; Doc. No. 48, p. 2).

Drivers who wished to participate in the KCMSD transportation service notified Defendant of their desire to do so (Doc. No. 43-1, ¶ 142; Doc. No. 48, p. 2). Drivers in this program were required to have CPR and sensitivity training (Doc. No. 43-1, ¶¶ 143, 144; Doc. No. 48, ¶ 143, 144). Drivers could not give their telephone numbers to student passengers (Doc. No. 43-1, ¶ 157; Doc. No. 48, p. 2).

Drivers were required to take a "School Cab Test" every school year (Doc. No. 43-1, ¶ 151; Doc. No. 48, p. 2). The School Cab Test was administered at Defendant's office (Doc. No. 43-1, ¶ 153; Doc. No. 48, p. 2). Upon completion, drivers would turn the test into the School Cab Office, part of Defendant's Contract Office (Doc. No. 43-1, ¶ 154; Doc. No. 48, p. 2). Defendant graded the test for correctness (Doc. No. 43-1, ¶ 155; Doc. No. 48, p. 2).

Drivers were paid for transporting students on a zone rate, based on three designated zones within KCMSD as established by KCMSD (Doc. No. 43-1, ¶ 140; Doc. No. 48, p. 2). A

driver's pay based on a zone rate was dependent upon the transportation being inter-zone or intra-zone (Doc. No. 43-1, ¶ 141; Doc. No. 48, p. 2). Defendant and drivers did not negotiate as to what driver would be paid for KCMSD trips (Doc. No. 43-1, ¶ 150; Doc. No. 48, p. 2). Drivers were responsible for their own fuel costs (Doc. No. 43-1, ¶ 123; Doc. No. 48, p. 2). Drivers received vouchers for KCSMD trips that Defendant would purchase back from the drivers (Doc. No. 43-1, ¶ 145; Doc. No. 48, p. 2). Defendant bought back the vouchers for a value less than the amount billed to KCMSD (Doc. No. 43-1, ¶ 147; Doc. No. 48, p. 2). Defendant paid the driver 70% of the voucher (Doc. No. 43-1, ¶ 148; Doc. No. 48, p. 2).

Defendant billed KCMSD based on the zone system (Doc. No. 43-1, ¶ 146; Doc. No. 48, p. 2). Defendant submitted the full value of the trip voucher to KCMSD for 100% reimbursement (Doc. No. 43-1, ¶ 149; Doc. No. 48, p. 2).

### C. Drivers' Arrangement with Defendant

From April 22, 2008 through December 31, 2008, Defendant classified drivers who provided transportation services pursuant to Defendant's contracts with KCATA and KCMSD as independent contractors (Doc. No. 43-1, ¶ 31; Doc. No. 48, p. 2). The independent contractor agreements signed by drivers were for a term of sixty (60) days (Doc. No. 43-1, ¶ 71; Doc. No. 48, p. 2). The independent contractor agreements did not automatically renew (Doc. No. 43-1, ¶¶ 72, 73; Doc. No. 48, p. 2). Drivers and Defendant did not always have valid contracts (Doc. No. 42 ¶ 183, n.8; Doc. No. 49 ¶ 183). Drivers sometimes continued driving past the sixty days of the contract without signing a new contract (Doc. No. 42 ¶ 183, n.8; Doc. No. 49 ¶ 183).

Drivers had to provide a vehicle; either their own personal vehicle or a leased vehicle (Doc. No. 41, ¶ 155). Drivers providing transportation pursuant to Defendant's contracts with KCATA or KCMSD could lease vehicles through Defendant (Doc. No. 43-1, ¶¶ 32, 45; Doc. No. 48, p. 2).

8

Drivers paid $450 per week to lease a vehicle (Doc. No. 43-1, ¶ 58; Doc. No. 48, p. 2). Leased vehicles used by drivers were titled to Spencer Leasing, LLC (Doc. No. 43-1, ¶ 46; Doc. No. 48, p. 2). Of the $450 weekly vehicle lease fees, $240 went to Defendant and $210 went to Spencer Leasing, LLC (Doc. No. 43-1, ¶ 58; Doc. No. 48, p. 2). Defendant's central cashier employees collected the lease fees and segregated the same for Spencer Leasing, LLC (Doc. No. 43-1, ¶ 55; Doc. No. 48, p. 2).

Drivers who leased vehicles owned by Spencer Leasing, LLC did not sign a separate lease contract with Spencer Leasing, LLC (Doc. No. 43-1, ¶ 65; Doc. No. 48, p. 2). Drivers who leased vehicles owned by Spencer did not sign any documents other than independent contractor agreements (Doc. No. 43-1, ¶ 67; Doc. No. 48, p. 2). On leased vehicles, maintenance services, provided by Spencer Leasing, LLC mechanics, were included in the lease fee that Defendant charged to drivers (Doc. No. 43-1, ¶ 76; Doc. No. 48, p. 2).

The $240 portion of the lease payment that went to Defendant was for leasing a two-way radio, a computer system, a top light, a taximeter, and a taxicab permit and for liability insurance and access to Defendant's dispatch service (Doc. No. 42, ¶ 148). Drivers who drove their own vehicle also paid $240 to Defendant to lease this equipment and for access to the dispatch service, but had to provide their own collision and liability insurance (Doc. No. 42, ¶ 150).

Defendant offered SAF and KCMSD trips to drivers; drivers were free to accept or decline trips (Doc. No. 42, ¶¶ 27, 52). Drivers could derive income from other sources than SAF or KCMSD trips (Doc. No. 42, ¶ 144).

II. **SUMMARY JUDGMENT**

Summary judgment requires that "the movant show that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro.

9

56(a). The court must give the nonmovant the benefit of all reasonable inferences to be drawn from the facts in the pleadings. Reich v. Conagra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993).

### III. FAIR LABOR STANDARDS ACT

The Fair Labor Standards Act has a minimum wage provision that requires "[e]very employer [to] pay to each of his employees who in any work week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce" a minimum wage. 29 U.S.C. § 206(a).

The Act also has an overtime provision that forbids an employer from employing

> any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Id. § 207(a)(1)

Plaintiff claims Defendant violated both of these provisions. Each of these provisions requires two attributes to make it applicable to the employer: (1) an enterprise engaged in commerce and (2) employees. Tony and Susan Alamo Foundation v. Sec. of Labor, 471 U.S. 290, 295 (1985). If these requirements are met, the Act must "be applied even to those who would decline its protections." Id. at 302. Whether the employer is an enterprise and whether the worker is an employee are each questions of law. Donovan v. Trans World Airlines, 726 F.2d 415, 417 (8th Cir. 1984); Donovan v. Weber, 723 F.2d 1388, 1392 (8th Cir. 1984).

#### A. Enterprise

Employee, commerce, and enterprise are defined in Section 203 of the Act. "'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). "Enterprise" is defined as:

10

the related activities performed (either through unified operation or common control) by any person or person for a common business purpose, and includes all such activities whether performed in one or more establishments operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor.

Id. § 203(r)(1).

The statute further defines "enterprise engaged in commerce" as:

> (s)(1)Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that--
>
> (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>
> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)

Id. § 203(s)(1)(A)(i)-(ii).

Defendant admits that it is an enterprise (Doc. No. 48, p. 1). Additionally, in 2008, Defendant's contracts with KCATA exceeded $500,000 in annual dollar volume and Defendant's contracts with KCMSD exceeded $500,000 in annual dollar volume. (Doc. No. 43-1, ¶¶ 15, 17; Doc. No. 48, p. 2). As Defendant admits it is an enterprise and the gross volume of business done under Defendant's contracts with KCATA and with KCMSD meets the requirement of Title 29 United States Code Section 203(s)(1)(A)(ii), I find that Defendant is an enterprise engaged in commerce.

### B. Employees

Whether the drivers are employees is an issue in both Plaintiff's and Defendant's motions for summary judgment. Defendant claims the drivers were independent contractors (Doc. No. 42, p. 5). Plaintiff claims the drivers were employees when driving for SAF or KCMSD assignments. (Doc. No. 43, p.1). Plaintiff bears the burden of proving the existence of an

11

employer-employee relationship. Reich v. Conagra, Inc., 987 F.2d 1357, 1361 (8th Cir. 1993).

Employee, as defined by the Act, is broader than the common law definition. Rutherford Food Corp. v. McComb, 331 U.S. 722, 726-27 (1947). "'[E]mployee means any individual employed by an employer." 29 U.S.C. § 203(e)(1). "'Employ' includes to suffer or permit to work." Id. § 203(g). "Employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." Id. § 203(d).

Defendant argues that employee versus independent contractor decisions from other non-Fair Labor Standards Act cases are influential here. The expansive definition of "employ" as "suffer or permit to work" makes the reach of the Fair Labor Standards Act greater than other statutes, such as ERISA[1] and ADA,[2] or the common law. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992). As such, a court decision that an individual is an independent contractor under a different statute is not determinative as to whether a similarly situated individual is an employee or independent contractor under the Fair Labor Standards Act.

Economic reality is the proper test of employment under the Act. Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961); Blair v. Wills, 420 F3d 823, 829 (8th Cir. 2005). The economic reality test is "a totality-of-the-circumstances approach." Baker v. Flint Eng'g & Const. Co., 137 F.3d 1436, 1441 (10th Cir. 1998). The Tenth Circuit supplies factors, none alone dispositive, to consider: (1) control of the business over the worker, (2) worker's opportunity for profit or loss, (3) worker's investment, (4) worker's permanence, (5) worker's skill, and (6) worker's integral part of the business. Id. at 1440-41. As the final step of the analysis, when looking at the findings from each of these factors, the court determines "whether [workers], as a

---

[1] The test for "employee" under the Employee Retirement Income Security Act (ERISA) is a common-law test focusing on "the hiring party's right to control the manner and means by which the product is accomplished." Nationwide Mut. Ins. Co. v. Darden, 503 U.S.318, 323 (1992).
[2] When determining who is an "employee" under the Americans with Disabilities Act (ADA), "the common-law element of control is the principal guidepost . . . ." Clackamas Gastroenterology, Assoc., P.C. v. Wells, 538 U.S. 440, 448 (2003)

12

matter of economic fact, depend upon [defendant's] business for the opportunity to render service, or are in business for themselves." Id. at 1443.

### 1) Control

Defendant, in complying with its contract with KCATA and KCMSD, controlled whom the driver picked-up, where the trip originated and ended, within what time period the trip began and ended, and the flat-rate amount of the fare. While drivers controlled whether or not to participate in SAF and KCMSD programs and controlled whether or not to a take a route, once the driver decided to take a route the details of the work were all controlled by Defendant. The lack of driver control suggests that drivers were employees when driving SAF or KCMSD routes.

### 2) Opportunity for Profit of Loss

"Generally speaking, an independent contractor has the ability to make a profit or sustain a loss due to the ability to bid on projects at a flat rate and to complete projects as it sees fit." Id. at 1444. Drivers are paid a fixed rate for SAF and for KCMSD routes. Drivers cannot negotiate a higher rate. With the origination and destination fixed and the number of passengers on the route fixed, the driver's potential for using his skill to make the trip more valuable was minimal. Drivers could potentially manage minor savings with driving habits that produced fuel efficiency and time savings, but under this flat-rate system there was no real incentive for the drivers to improve efficiency. Nor could drivers develop business for their traditional taxicab services as they were not allowed to market their services to SAF or KCMSD passengers.

Defendant argues drivers had the opportunity for substantial profits by working hard or by doing work for other transportation companies. While it is true drivers could make more money by taking more routes, that has no bearing on how much money the driver could have made on the individual routes. The driver's ability to make more money by driving additional routes is akin to a waiter making more money by taking another shift. The decision to work

13

longer or shorter hours does not make the opportunity within the individual work shift any greater. Additionally, there was little risk of loss to the drivers. While SAF passengers might not pay their co-pay, the drivers were guaranteed the KCATA part of the payment. Drivers had to cover leased equipment costs, but within the SAF and KCMSD system the drivers had no opportunity to earn more, no opportunity to earn less.

The lack of opportunity for profit or loss suggests that drivers were employees when driving SAF or KCMSD routes.

### 3) Investment

Investment refers to capital expenditures not negligible items. Id. at 1442. This factor and the opportunity for profit and loss factor are interrelated. Id. The worker supplying his or her own tools, by itself, does not make the worker an independent contractor. Id. The investment of the worker can be compared to the investment of the business in the overall operation when determining the significance of the worker's investment. Id.

Here, all drivers had to invest in either a personal vehicle or a leased vehicle, as well as paying to lease items needed for traditional taxicab services, e.g., taximeter, Defendant's dispatch services, and taxicab top light. Drivers paid for their own gas. Drivers' expenses needed to be covered in order for drivers to make a profit. While purchasing a vehicle is a significant cost, the vehicle was not simply a work investment, but also the driver's personal vehicle. Further, Defendant had to invest significant capital to buy the vehicles available in its lease program.

The amount of the drivers' individual investments necessary to drive for the SAF and KCMSD programs is not significant. The vehicles, whether personally owned or leased, were not simply work investments. While the expenses were probably significant to the individual drivers, their individual investments were disproportionately small when compared to

14

Defendant's investments in a fleet of vehicles, land to run the operation, personnel to run the operation, and other overhead expenses.

The low capital expenditure required of drivers suggests that drivers were employees when driving SAF or KCMSD routes.

### 4) Permanency

Drivers initially signed sixty-day contracts with Defendants. The record shows some drivers continued working past the sixty-day point without signing new contracts. This appears to be due to sloppiness in Defendant's record keeping. The record does not indicate the length of time drivers typically drove under some association with Defendant—whether under signed contracts or not. Nor does the record indicate whether drivers regularly drove for Defendant while simultaneously driving for other transportation companies or if drivers rotated between transportation companies. Regardless, nothing in the nature of traditional taxicab work would preclude a long-term relationship with a particular taxi company from still being an independent contractor relationship.

This factor is not material to resolving the dispute as regardless of what additional information would show it does not alter the analysis.

### 5) Skills

Defendant argues that drivers exercise special skills in carrying out their duties as drivers under SAF and KCMSD. Defendant's claim that drivers' skills increased efficiency is dubious as stops and much of the route were determined by Defendant's dispatcher. Driving and familiarity with town are not skills unique to cab drivers or even to the broader category of commercial drivers. Further, drivers in the SAF and KCMSD programs were not selected for the program based on their skills, nor were they rewarded with increased compensation based on their skills.

15

The lack of specialized skill required suggests that drivers were employees when driving SAF or KCMSD routes.

### 6) <u>Integral Part of Business</u>

This factor focuses on whether the "workers' services are a necessary component of the [defendant's] business." <u>Id.</u> at 1443. Defendant's contracts with KCATA and KCMSD were significant sources of revenue for Defendant. Despite Defendant's assertions that Defendant was simply a dispatch and leasing business, its contracts required Defendant to provide transportation. To provide these contracted services, Defendant needed drivers. The drivers were an integral part of Defendant's business.

The integral nature of drivers to Defendant's business suggests that drivers were employees when driving SAF or KCMSD routes.

### 7) <u>Economic Dependence</u>

Economic dependence refers to the worker's "dependence on that job for that income to be continued . . . ." <u>Id.</u> Economic dependence does not mean subsistence. <u>Id.</u> Here, the drivers were economically dependent on Defendant. Drivers could not negotiate individually with KCATA or KCMSD and could only participate in these programs due to their association with Defendant. Without Defendant, SAF and KCMSD income would not continue. On this basis, I find that drivers driving under the SAF and KCMSD program were economically dependent on Defendant.

### 8) <u>Employees Conclusion</u>

Drivers had to supply their tools (vehicles, fuel) and had flexibility on accepting routes. Otherwise, drivers functioned largely as traditional employees told when, where, and how to work; told how much they will be paid; and not given an opportunity to increase their profits through their own ingenuity on the route. Drivers were essential to the success of the overall

16

Defendant's business and were economically dependent on Defendant.

On this basis, under the Fair Labor Standards Act definition, I find that drivers, driving for the SAF and KCMSD programs, were Defendant's employees.

### C. Taxicab Exemption

The Fair Labor Standards Act provides an exemption to the overtime pay requirements in some circumstances. Pertinent here, is the exemption for taxicab businesses:

> (b) Maximum hour requirements—The provisions of section 207 of this title shall not apply with respect to
> . . .
> (17) any driver employed by an employer engaged in the business of operating taxicabs

29 U.S.C. § 213(b)(17).

As with the employee issue, the taxicab exemption is looked at only in reference to Defendant's contracts with KCATA and KCMSD. Whether Defendant or drivers would qualify for the taxicab exemption when doing traditional metered taxi driving or while operating under other contracts is not at issue.

The Defendant bears the burden to prove it qualifies for the taxicab exemption. Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 209 (1966). "Exemptions are to be narrowly construed against employers seeking to assert them." Hearnsberger v. Gillespie, 435 F.2d 926, 929 (8th Cir. 1970). Exemptions are limited "to those situations that 'plainly and unmistakably' come within the terms and spirit of Section 13 [sic] exemption provisions." Id.

The statute does not define the phrase "business of operating taxicabs." "Unless the statute indicates otherwise, the words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" National R.R. Passenger Corp. v. Morgan, 536 U.S 101, 110 n.5 (2002). The Kansas City, Missouri Code of Ordinance defines taxicab as:

> a public passenger motor vehicle with a passenger carrying capacity of six or less with driver, furnished for hire on a call or demand basis to transport persons, packages or messages, where the route traveled and trip destination are

17

> controlled by the passenger, and at a charge or fare based upon time and mileage and recorded and indicated on a taximeter.

Kansas City, Mo., Code § 76-32.

Kansas City defines taxicab company as:

> An individual, firm, corporation, association, partnership, or cooperative that owns, controls, and operates a taxicab service utilizing taxicab permits of which it is the holder.

Id.

Defendant's only argument is that if it is an employer then it must be a taxicab company. This conclusion is erroneous. As Defendant itself has noted, Defendant's income came from different sources such as dispatching services, leasing vehicles, and taxicab services. Defendant is clearly a taxicab company, among other things. But, when the drivers were driving under the SAF and KCMSD programs they were not functioning as taxicabs as that term is commonly understood. No meter was dropped and the fare was not determined by distance or time as recorded by a taximeter. Instead the fare was set by contract with between Defendant and KCATA or KCMSD, regardless of the actual distance or time. As such, when drivers were driving for SAF or KCMSD, Defendant was not engaging in the business of operating taxicabs. Based on the above, I find the taxicab exemption was not applicable to Defendant while employing drivers under the KCATA and KCMSD contracts.

### IV. CONCLUSION

From April 22, 2008 to December 31, 2008, Defendant was an enterprise engaged in commerce, and the workers, when driving for Defendant under SAF and Kansas City, Missouri School District contracts, were employees of Defendant. Further, Defendant does not qualify for the taxicab exemption. Defendant was required to comply with the Fair Labor Standards Act, Title 29 United States Code Sections 206 and 207. There are no issues of material fact and

18

Case 4:10-cv-00887-REL   Document 55   Filed 08/28/12   Page 18 of 19

Plaintiff is entitled to judgment as a matter of law on the determination of employees, enterprise engaged in commerce, and taxicab exemption.

Based on the above, it is

ORDERED that Defendant's Motion for Summary Judgment is denied. It is further

ORDERED that Plaintiff's Motion for Summary Judgment is granted.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 28, 2012